UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

WILLIAM R. BERTHA,

        Plaintiff,

        v.                                    Case No. 04-C-0515(E)

REMY INTERNATIONAL, INC.,
REMY, INC.,

        Defendants.

---

DECISION AND ORDER DENYING MOTION FOR LEAVE TO FILE SURREPLY BRIEF AND GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

        Plaintiff, William R. Bertha, sues defendants Remy International, Inc., and Remy, Inc., for failure to pay compensation as promised in an oral contract or on the basis of promissory estoppel. Defendant Remy, Inc., has not been served with the Amended Complaint, which is the current operative pleading. Defendant Remy International, Inc., moves under Fed. R. Civ. P. 12(b)(6) to dismiss the Amended Complaint. The defendants are generally referred to together as "Remy."

        Remy International contends that Bertha's claims are legally precluded by Wis. Stat. § 452.20 because Bertha is not a licensed broker. It argues that under Wisconsin law a brokerage contract is void — hence, a broker is barred from recovering compensation for his services — if the broker is not licensed. In response, Bertha maintains that he was not acting as a broker when he provided services on behalf of Remy International; if he was acting as a broker, he did not do so within Wisconsin; and the transaction contemplated here

was the purchase of the stock of a corporation by Remy, which is outside the reach of Wis. Stat. ch. 452.

## MOTION FOR LEAVE TO FILE SURREPLY BRIEF

Local rules permit the filing of a brief in support, a brief in opposition, and a brief in reply. Following permitted briefing of Remy's motion to dismiss, counsel for Bertha filed a letter to "update" the court on two matters regarding the motion to dismiss. The first matter was indeed an "update," as counsel indicated the parties had agreed that Remy, Inc., would not be served and the court could decide Remy International's motion without waiting for service on Remy, Inc. The second matter was more than an "update," as counsel wrote almost a full page of single-spaced text in which he argued that Remy had improperly cited new cases in its reply brief and then argued that the cases were distinguishable.

Remy opposed the filing of such a letter, and in response to that Bertha filed a formal motion seeking leave to file a surreply brief, which would cover the subject matter in the previous letter to the court. Remy then opposed the motion for a surreply.

The court does not want any further briefs filed regarding the motion to dismiss, so the motion for leave to file some as-yet-untendered surreply brief will be denied. That leaves the question of what to do with the letter filed by Bertha, in which he contends both that Remy raised an issue in its opening brief without citation to authority but then cited cases in its reply brief, and that the cases are distinguishable.

Although a reply brief "must be limited to matters in reply," Civil L.R. 7.1(f), parties are allowed to cite new cases in a reply brief so long as they are in reply to the opposition brief. The issue on which Bertha seeks a reply is one that concerns a defense by Bertha to Remy's motion to dismiss, which Remy raised preemptively in its opening brief.

2

Remy did not have to raise the issue at all, but it did. However, the court is not going to delve into this side issue of whether Remy should have cited all possible cases when preemptively raising and rejecting an anticipated defense by Bertha in its opening brief. To simplify matters, the court will not consider Bertha's letter filed February 23, 2005, because the letter has no bearing on the outcome of the motion to dismiss. The court arrived at its decision on the motion to dismiss independently of any arguments contained in Bertha's letter.

## MOTION TO DISMISS

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint to state a claim on which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). Dismissal of an action on such a motion is warranted if the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *Scott v. City of Chicago*, 195 F.3d 950, 951 (7th Cir. 1999); *see Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The essence of a Rule 12(b)(6) motion is not that the plaintiff has pleaded insufficient facts; it is that even assuming all of his facts are accurate, he has no legal claim. *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 627 (7th Cir. 1999).

According to the pleadings, the parties appear to be diverse, although further proof of that will be required.[1] The amount in controversy exceeds the amount required for

---

[1] Although the court is issuing this decision on the merits, it is not fully satisfied with evidence that subject matter jurisdiction exists. According to the Amended Complaint, Bertha is a citizen of Wisconsin, and Remy International and Remy, Inc., have their principal places of business in Indiana. However, the Amended Complaint does not assert the state of incorporation for Remy International or Remy, Inc. If either is incorporated in Wisconsin, the case will fail regarding diversity jurisdiction.

This case was removed from the Circuit Court for Milwaukee County. The notice of removal indicated, as was asserted in the original complaint, that Bertha was a Wisconsin citizen. The notice of removal further indicated that the original defendant, Delco Remy International, Inc., was incorporated in Delaware and had its principal place of business in Indiana. Therefore, diversity jurisdiction existed at that time. But in the Amended Complaint Bertha replaced Delco Remy with the present defendants. He asserted that Remy International, Inc., and Remy, Inc., were the same entity as Delco Remy or were Delco Remy's successors in interest. However, from this allegation, it is unclear whether the present defendants have the same state of incorporation as Delco Remy.

Neither party sought a remand for lack of subject matter jurisdiction after the filing of the Amended Complaint, so it is likely that diversity jurisdiction still exists. Nevertheless, the court must police subject matter jurisdiction on its own. Therefore, the present defendants will be required to file an affidavit regarding their states of incorporation.

3

diversity jurisdiction. *See* 28 U.S.C. § 1332.

In a diversity case, state law applies. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Both parties argue Wisconsin substantive law, and no other state's law appears more appropriate. Hence, this court will look to Wisconsin law.

The court must apply substantive law as declared by Wisconsin's highest court. *Home Valu, Inc. v. Pep Boys – Manny, Moe & Jack of Del., Inc.*, 213 F.3d 960, 963 (7th Cir. 2000); *see Erie*, 304 U.S. at 78-79. However, if Wisconsin law is unclear because the Supreme Court of Wisconsin has not spoken on the issue, this court must predict how that court would decide the question. *Rodman Indus., Inc. v. G & S Mill, Inc.*, 145 F.3d 940, 942 (7th Cir. 1998).

The operative pleading under attack is the Amended Complaint filed December 22, 2004. Although in its motion to dismiss Remy quotes and discusses allegations of the original complaint, the original complaint has been replaced completely by the Amended Complaint, and the allegations of the original complaint have no significance at this time.

In the Amended Complaint, Bertha asserts that he is a financial advisor and consultant assisting corporate clients in assessing and making strategic business acquisitions. (Am. Compl. ¶ 3.) He is a licensed securities broker. (*Id.*) He resided in and operated his business from Wisconsin. (*Id.* ¶ 4.) He asserts that in June 2000, defendants contacted him to act as a "financial advisor to Remy in assessing multiple strategic acquisitions for Remy including companies such as . . . Prestolite, Inc." (*Id.*) Remy hired Bertha because of his knowledge and familiarity with the particular companies Remy was contemplating acquiring and in particular because of Bertha's business relationship with Prestolite. (*Id.* ¶ 5.) Under their initial agreement, Bertha was to be paid a percentage of the closing price. (*Id.* ¶ 6.)

4

After some months, Remy indicated that Bertha should focus on Prestolite rather than other targets. (*Id.* ¶ 7.) Prestolite was located in Michigan, with plants in other parts of the world, although not in Wisconsin. (*Id.*) The transaction was anticipated to be the purchase of Prestolite's common stock by Remy. (*Id.*) In the fall of 2002, the potential purchase progressed to

> a high level meeting between the management of the Remy and Prestolite which was coordinated in large part by Plaintiff, in that he arranged for the meeting time and location. Both Prestolite and Remy brought their own employees to this meeting who discussed between themselves the benefits of the potential deal.

(*Id.*) Between November 2002 and February 2003, Bertha "assisted in further facilitating the discussion between the management of Remy and Prestolite as to the value of the acquisition by Remy, but the negotiations over the actual terms of the proposed deal were between the shareholders of the Prestolite . . . and Remy . . . , who were large, private equity venture funds, assisted by their own fina[n]cial advisors and lawyers." (*Id.* ¶ 8.) According to the Amended Complaint, at no time did Bertha represent Remy in negotiating the terms of the proposed deal. (*Id.*) Bertha did not communicate to Prestolite, on Remy's behalf, any terms of purchase. (*Id.*) All discussions of terms of the proposed deal occurred between the shareholders of the two companies, and all such discussions between them occurred outside Wisconsin. (*Id.*)

In or around March 2003, Remy abrubtly canceled a meeting with Prestolite and said it had decided not to pursue the transaction further. (*Id.* ¶ 9.) After the deal fell apart, Prestolite put itself up for sale via an auction process, in which companies could bid for the stock of Prestolite. (*Id.* ¶ 10.) "Prestolite and its investment banker (CIBC) were in constant contact with Plaintiff during this time period and Plaintiff worked on Remy's behalf to have them included in the auction process." (*Id.*)

In May 2003, Remy terminated its agreement with Bertha. (*Id.* ¶ 12.) Nevertheless, Remy was attempting to become involved in the auction process for Prestolite. (*Id.* ¶¶ 13-14.) When Bertha learned of Remy's activity to enter the bidding process for Prestolite, he contacted Remy's CEO, Tom Snyder, and said his contract still bound Remy. (*Id.* ¶ 15.) Following a discussion, Snyder, on behalf of Remy, and Bertha agreed to a new compensation arrangement for Bertha. (*Id.*) Bertha asserts that Remy agreed to pay Bertha $400,000 as compensation, regardless of whether the deal closed. (*Id.*) Remy agreed that if the deal closed, it would compensate Bertha further in future financial quarters. (*Id.*) Bertha asserts that as a result of Remy's promise, Bertha did not pursue other potential consulting opportunities. (*Id.*)

Bertha and Remy then "engaged in numerous planning and strategic discussions regarding the auction process and the strategy for the purchase of Prestolite. At no time, however, did Plaintiff negotiate with Prestolite over any terms of any proposed agreement." (*Id.* ¶ 16.)

Through the bidding process, Prestolite was sold to another company not affiliated with Remy. (*Id.* ¶ 17.) Bertha demanded $400,000 from Remy, but Remy refused to pay. (*Id.* ¶ 18.) Bertha now asserts claims of breach of contract and promissory estoppel, seeking $400,000 as damages.

> Wisconsin Statute § 452.20 provides that
>
> [n]o person engaged in the business or acting in the capacity of a broker . . . within this state may bring or maintain an action in the courts of this state for the collection of a commission or compensation for the performance of any act mentioned in this chapter without alleging and proving that he or she was a duly licensed broker . . . at the time the alleged cause of action arose.

6

"Broker" means, among other things, anyone who "[f]or another and for commission, money or other thing of value, negotiates or offers or attempts to negotiate a sale, exchange, purchase, or rental of any business, its goodwill, inventory, fixtures or an interest therein." Wis. Stat. § 452.01(2)(d). "Negotiate," in turn, means "act[ing] as an intermediary between the parties to a transaction, including . . . (a) Facilitating or participating in the parties' discussion of the terms of a contract or agreement concerning a transaction." § 452.01(5m). "'Party' means a person seeking to sell, exchange, buy or rent an interest in real estate, a business or a business opportunity." § 452.01(5r). "Transaction" means "the sale, exchange, purchase or rental of, or the granting or acceptance of an option to sell, exchange, purchase or rent, an interest in real estate, a business or a business opportunity." § 452.01(10).

If Wis. Stat. § 452.20 applies, both claims in this case must be dismissed, as Bertha does not, as required by the statute, allege in the Amended Complaint that he is a duly licensed broker under Wis. Stat. ch. 452. Notwithstanding the language in § 452.20 referring to actions brought in state courts, the statute bars actions brought in federal court as well. *Reed v. Kelly*, 177 F.2d 473, 475 (7th Cir. 1949); *George Nangen & Co. v. Kenosha Auto Transp. Corp.*, 238 F. Supp. 157, 159 (E.D. Wis. 1965) (Grubb, J.).

Interpretation of this Wisconsin statute requires focus on the language of the statute. *State v. Greve*, 2004 WI 69, ¶ 16, 272 Wis. 2d 444, ¶ 16; *State ex rel. Kalal v. Circuit Ct. for Dane County*, 2004 WI 58, ¶ 44, 271 Wis. 2d 633, ¶ 44. If the meaning of the statute is plain from its language, the inquiry into its meaning ends. *Kalal*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, ¶ 45. Statutory language is given its common, ordinary meaning, except that specially-defined words or phrases are given their specially-defined meanings. *Id.* The context and structure of the statute are important to what the plain language means. *Id.*, ¶

7

46. Further, statutory language is read to give reasonable effect to every word, and to avoid absurd results. *Id.* "If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning." *Id.* (internal quotation marks omitted).

Two of Bertha's arguments can be disposed quickly. First, Bertha argues that he was not a broker because he did not "negotiate" any transaction between Remy and Prestolite. He argues that he did not actually participate in any discussions or meetings regarding terms of a potential deal. However, the plain language of § 452.01(5m)(a) defines "negotiate" to include "[f]acilitating . . . the parties' discussion of the terms of a contract or agreement concerning a transaction." § 452.01(5m). In the Amended Complaint Bertha asserts that he coordinated a "high level meeting" between the managements of Remy and Prestolite, including arranging the meeting time and location. (Am. Compl. ¶ 7.) Then, over the course of about four months, Bertha "assisted in further facilitating the discussion between the management of Remy and Prestolite as to the value of the acquisition by Remy." (*Id.* ¶ 8.) Under the plain language of the statute, Bertha's arrangements for the meeting of managements and his furthering of discussions between the parties thereafter constitute facilitating, and thus negotiating, under § 452.01(5m)(a).

Bertha argues that he could not have been negotiating during the auction process, but his allegations establish the contrary. He asserts that during the auction process Prestolite remained in contact with him, that he worked on Remy's behalf to get them into the auction process, and that he helped Remy plan a strategy for the auction process. (Am. Compl. ¶¶ 10, 16.) Thus, he was still "facilitating" the parties' interactions concerning a transaction.

8

Wisconsin case law is in accord. In *Greenlee v. Rainbow Auction/Realty Co.*, Greenlee, who was not a licensed broker, set up a meeting between a representative of a business and real property seller and a potential buyer. 202 Wis. 2d 653, 659 (Ct. App. 1996). Although Greenlee was present at the meeting and introduced the representatives to each other, he did not otherwise participate in the meeting. *Id.* Prior to the meeting Greenlee provided the potential buyer with information about the business and property. *Id.* at 666. After the meeting, he had no further involvement in negotiations. *Id.* at 659.

The Wisconsin Court of Appeals found that Greenlee was acting as a broker under the definition in § 452.01(2)(d). *Id.* at 665-66. His introductions and passing of information to the buyer constituted acting as an intermediary and facilitating the parties' discussions. *Id.* at 66.

The court acknowledges that District Judge John W. Reynolds held that a plaintiff was not acting as a broker under what is now chapter 452 because he did not participate in actual negotiations, even though the plaintiff had placed the parties to the transaction in contact with each other and arranged a meeting. *Schaller v. Litton Indus., Inc.*, 307 F. Supp. 126, 128-29, 134 (E.D. Wis. 1969). However, *Schaller* preceded by several years the statutory definition of "negotiate" now in § 452.01(5m). In 1993, the Wisconsin legislature defined "negotiate" in the statute, Wis. Stat. Ann. § 452.01 historical and statutory notes, and that statutory definition controls today. Under the present definition, which refers to facilitation, the actions Schaller took would be considered negotiation that would bring him within the scope of the statute. *Greenlee*, which is a more recent case from the state courts, rejected *Schaller* on this point and due to *Schaller*'s "brevity of analysis." *Greenlee*, 202 Wis. 2d at 667-68.

9

Case 2:04-cv-00515-CNC    Filed 01/31/06    Page 9 of 20    Document 56

Second, Bertha submits that he was not negotiating or acting as a broker "within this state," as required in Wis. Stat. § 452.20, because the meetings between Remy and Prestolite occurred outside of Wisconsin, Remy is located in Indiana (Am. Compl. ¶ 2), Prestolite is located in Michigan and has no plants or real property in Wisconsin (*id.* ¶ 7), and Bertha's contracts with them occurred out of state or by telephone. However, Bertha says he resides in Whitefish Bay, Wisconsin, and operated his business from Wisconsin. Regardless of where actual physical meetings between Remy and Prestolite occurred or whether Bertha met with the companies outside of Wisconsin as well, Bertha was "facilitating" – i.e., making the arrangements and furthering the companies' discussions – from Wisconsin. Where telephone calls were directed is immaterial if Bertha was initiating the calls from Wisconsin. Bertha points to *Paulson v. Shapiro*, 490 F.2d 1 (7th Cir. 1973), as support for his argument that he was not conducting brokerage activities in Wisconsin. But *Paulson* differs because, although the real estate being discussed in that case was located in Wisconsin, the alleged broker had his office in Illinois and was physically in Illinois and Tennessee (not Wisconsin) when conducting brokerage activities. Also, Bertha's Amended Complaint indicates that he was in Wisconsin when making arrangements and furthering the companies' discussions. Moreover, like *Schaller*, *Paulson* based its decision regarding whether the alleged broker was "negotiating" a lease on the court's own definition of "negotiation," which preceded the statutory definition now in § 452.01(5m), and the court addressed the alleged broker's contacts with a prospective tenant rather than with its own client. Again, under the present definition of "negotiate," which refers to facilitation as well as interaction with both parties to a transaction (not just the prospective purchaser) this court believes that the Seventh Circuit would come to a different conclusion if *Paulson* were before that court today.

10

However, Bertha's remaining argument has merit. He contends that the sale or purchase of a "business" as used in § 452.01(2)(d) means the sale or purchase of assets rather than the sale or purchase of a corporation's stock. Bertha supports his argument with two Wisconsin Attorney General opinions as well as a federal district court opinion.

At first glance, "business" could be thought ambiguous. The term can be defined as both "the activity of buying and selling, trade / active selling, transactions" as well as "a commercial firm or enterprise." New Lexicon Webster's Dictionary of the English Language 132 (1989). On the other hand, the language of the statute provides support for Bertha's argument that "business" does not mean the firm or enterprise. Although § 452.01(2)(d) speaks of the sale or purchase of a "business," the term "business" is not defined. However, "business entity" is defined as any organization or enterprise, other than a sole proprietorship, operated for profit or operated not for profit but nongovernmental. § 452.01(3j). Therefore, a natural reading of the statute is that "business" differs from "business entity." Reading the term "business" in the context of the rest of the statute, it must be separate from or broader than "business entity."

Further evidence that "business" as used in § 452.01(2)(d) does not refer to the purchase of corporate stock is that sales of corporate stock are governed by a separate chapter of the Wisconsin Statutes. Chapter 551 governs sales of securities and the licensing of securities "broker-dealers." Wis. Stat. §§ 551.02(3), (13), 551.31. Whether the Remy/Prestolite transaction was or would, if consummated, have been governed by chapter 551 is beyond the scope of the present decision. But because sales of corporate stock are specifically governed by securities laws suggests strongly that they are outside the intended scope of § 452.01 and 452.20.

11

In addition, Wisconsin business law, as pronounced by the Supreme Court of Wisconsin, recognizes that stock and asset transfers are fundamentally different transactions. *Columbia Propane L.P. v. Wis. Gas Co.*, 2003 WI 38, 261 Wis. 2d 70 ("[I]t is important that we not blur, but rather maintain, the well-established and fundamental distinction between an asset purchase and a stock purchase."). Generally, in an asset purchase transaction, the purchaser does not acquire liabilities of the corporation as a stock purchaser would. *Id.*, ¶¶ 15, 22, 23. Further, while in an asset purchase transaction title to property transfers from one party to another, in a stock purchase transaction the corporation's assets remain titled in the corporation's name. In the latter situation, that ownership and control of the corporation changed does not mean that ownership of any property or what the corporation does changed. Corporations have identities separate and distinct from their shareholders.

The distinction between stock and asset transfers is well recognized, and Remy offers no basis for believing that the Wisconsin legislature disregarded the distinction for purposes of § 452.01 and conflated the two distinct conepts into the word "business." With such a well-recognized distinction, the legislature, if it wished § 452.01(2)(d) to apply as if such a distinction did not exist, would have to so state with specificity.

In 1960, the Wisconsin Attorney General was asked whether a licensed securities dealer had to be licensed as a real estate broker, under the provisions now known as §§ 452.01 and 452.20, to negotiate for the sale of a business by means of a stock transaction, where the business held real estate, inventory, and goodwill. He was asked, conversely, whether a real estate broker had to be licensed as a securities dealer to do so. The definition of real estate broker at that time included one who for another and for commission "sells, exchanges, buys or rents, or offers or attempts to negotiate a sale,

12

exchange, purchase or rental of any business, its good will, inventory, fixtures or an interest therein." 49 Wis. Op. Att'y Gen. 4, 5 (1960) This is similar to the language in § 452.01(2)(d) today.

The Wisconsin Attorney General opined that the purchase of a business through a stock transaction fell under the regulations for a securities transaction and license rather than for a real estate or property transaction and license. He noted that a corporation owns title to its corporate real estate or other property and that, although a securities dealer could not negotiate a sale or purchase in which transfer of title to the property would pass to a third party, he could negotiate for the purchase or sale of the shares of stock in the corporation.

> It makes no difference what the corporate property consists of, whether it be real estate alone or good will, fixtures, furniture, accounts, etc., as title to the property remains in the corporation or is merged into the surviving corporation. The dealer in such case is doing exactly what he is authorized to do by statute. He is dealing in securities.

*Id.* at 8. The Attorney General addressed the word "business" and found that it did not mean the corporate entity:

> In the situation with which you are concerned, it is evidently contemplated that money would pass to the persons owning the corporate stock and that those individuals would then assign said stock to the purchasers. This latter transaction is essentially a securities transaction and is not a transaction . . . which a real estate broker is permitted to engage in under ch. 136 [now ch. 452[2]]. The word "business" is not fully defined in sec. 136.01, but it is not a synonym for the word "corporation" or for the word "security." A corporation may conduct a business and own real estate and personal property.

*Id.*

---

[2] *Chapman Co. v. Serv. Broad. Corp.*, 52 Wis. 2d 32, 34 n.1 (1971).

13

The Attorney General rejected the argument that Remy advances here; i.e. the use of the stock transaction is merely a convenient way to acquire the assets of a corporation and the purchase of all or a controlling amount of stock is tantamount to purchase of a corporation's assets. *Id.* at 8-9. He opined that the license required for the purchase of a corporate business by means of a stock transaction was a securities license and not a real estate broker license. *Id.*

A few years later, a successor Attorney General confirmed the soundness of the 1960 opinion. 55 Wis. Op. Att'y Gen. 152, 153 (1966) ("I have reviewed the opinion in 49 OAG 4 in detail, and I am of the opinion that the conclusion there reached at page 9 is sound . . . .").

Remy points to no authority indicating that the Wisconsin legislature and courts have rejected these opinions by the Attorneys General. The opinions have stood for forty years and comport with the recognized distinction between asset purchases and stock purchases.

While no Wisconsin case law appears to address the particular question raised here, state case law is consistent with the Wisconsin Attorney General opinions. In *Chapman Co. v. Service Broadcasting Corp.*, for instance, the Supreme Court of Wisconsin found that negotiations for "Radio Station WAXO-FM, Kenosha, Wisconsin," 52 Wis. 2d 32, 36 (1971), concerned an "entire business," falling "squarely within the specific definition of a business opportunity broker, and now denominated as a real estate broker in sec. 136.01, Stats," *id.* at 38. The contract at issue involved the sale of the radio station as a business, not the stock of the corporation owning the radio station; and what is now § 452.20 applied to bar the recovery of any commission. In *Greenlee,* 202 Wis. 2d at 656, recovery of a commission

14

relating to the sale of a defunct truck stop was denied under § 452.20. The contract providing for a commission described the truck stop and its property, consisting of equipment, goodwill, and real estate. *Id.* at 658-59. Again, the sale of shares of stock in a corporation were not involved, and § 452.20 applied.

The closest cases to the present situation come from this district. *Schaller* involved a "matchmaker" plaintiff who believed that a Milwaukee corporation called Louis Allis was a susceptible merger candidate for Litton Industries. He worked to interest Litton in Louis Allis and putting the parties in touch with each other. After holding that what is now § 452.20 did not apply to the plaintiff's claim for a commission, U. S. District Judge Reynolds indicated in dicta that Wisconsin securities broker laws applied to limit the reach of the business and real estate broker provisions of the statutes to stock transactions like mergers:

> I think I should say something about the scope of the real estate broker's statute (Chapter 136) and how it is limited by the securities laws (Chapter 189) [now Chapter 551] of the State of Wisconsin, and what effect this has on this case.
>
> . . . .
>
> Chapter 189 deals with the problems involved in the transfer of those businesses, or parts of businesses (which may include real estate), where the transfer is effectuated by the transfer of stock or securities. From the point of view of subject matter, Chapter 189 has more to do with this case than Chapter 136.

307 F. Supp. at 134. Judge Reynolds then pointed to the two Wisconsin Attorney General opinions noted above for further support.

Although the pertinent language on this point is dicta, *Schaller* nevertheless is consistent with this court's interpretation of §§ 452.01 and 452.20.

15

The parties in *George Nangen & Co.* entered into an agreement pursuant to which the defendant hired the plaintiff to find a buyer "for its business of highway transportation of automobiles." 238 F. Supp. at 158. Business assets included real property. *Id.* A subsequent agreement between the parties provided that the sale could be of assets *or* of the capital stock of the defendant. *Id.* The plaintiff found a buyer and the terms of purchase, as negotiated, appear to have provided for sale of the capital stock of the corporation. *See id.* at 159. The unlicensed plaintiff argued that the sale of capital stock took the transaction out from the bar of what is now § 452.20, allowing him to recover a commission. *Id.* The court disagreed:

> In its complaint plaintiff alleges that defendant employed it to find a buyer for its business. It does not offer proof that its activities were those of a securities' broker or that it qualified as such under Chapter 189 of the Wisconsin Statutes. The sale of defendant's business involved transfer of ownership of substantial real estate and other assets located in the State of Wisconsin. On the record as presented on this motion, plaintiff acted as a broker for defendant in finding a purchaser for its business.

*Id.*

*George Nangen & Co.* is unclear on a key point. Whether the final purchase agreement involved only a transfer of stock or a may have apparently argued that the negotiated terms of sale provided for sale of stock and not of real property, the court indicated that the sale did involve transfer of ownership of real property and other assets. *Id.* If the latter were true, the transaction fell easily within the scope of the real estate broker's statutes. If the former were true, the court's opinion is unconvincing, as it does not acknowledge the possible difference in effect or, importantly, the Wisconsin Attorney General opinion that had previously issued.

16

But even if the former was true, the present case differs. The complaint in *George Nangen & Co.* did not claim that the plaintiff qualified as a securities broker or that his activities fell within that licensing scheme. *Id.* Further, even if the final sale had been structured as a stock transfer rather than an asset transfer, the original agreement between the unlicensed broker and the seller did not specify that a stock transfer transaction was all that would be sought, and the amendment to the agreement indicated that the sale could involve assets *or* capital stock. *Id.* at 158. Therefore, the plaintiff's actions in negotiating the deal between a prospective purchaser and seller likely crossed the territory of a real estate broker and a securities broker.

Remy points to cases from other jurisdictions, in which the courts addressed similar broker's or real estate broker's commission statutes and held that the sale of all or a controlling portion of the stock of a corporation was equivalent to the sale of all of the corporation's assets. *See Shochet Sec., Inc. v. First Union Corp.*, 663 F. Supp. 1035 (S.D. Fla. 1987); *J.L. Kislak, Inc. v. Carol Mgmt. Corp.*, 184 N.Y.S.2d 315 (App. Div. 1959); *Schmitt v. Coad*, 604 P.2d 507 (Wash. Ct. App. 1979). This court does not find these cases persuasive. Most are lower court opinions. More importantly, these cases do not indicate circumstances similar to those here – where two state Attorneys General have opined that stock transactions differ from other transactions for purposes of the broker's license and the state legislature has defined "business entity" but not "business." Further, *Shochet Securities* involved little analysis, and *J.L. Kislak* involved the stock of "F.H.A. corporations," whose sole assets consisted of mortgaged property. The *J.L. Kislak* court noted that "[w]here a transfer of realty is only an incident in the selling of a going business, no real estate license is

17

needed." 184 N.Y.S.2d at 317.[3]

It is significant that these cases from other jurisdictions fly in the face of the case law from the Supreme Court of Wisconsin regarding the difference between asset and stock transfers. For instance, the court in *Morad v. Haddad*, 110 N.E.2d 364, 367 (Mass. 1953), stated that

> [t]he sale of all of the stock of the corporation was in legal effect a sale of all of its assets, and the mere fact that the parties found it more convenient to transfer all of the stock rather than to make a conveyance does not change the substance of the transaction.

But the Supreme Court of Wisconsin, in a much more recent opinion, found the opposite:

> Finally, we briefly address Columbia Propane's argument that the change from a stock purchase to an asset purchase was merely a change in form, which had the same effect. . . .
>
> . . . .
>
> . . . [A]s previously discussed, the difference in a buyer's assumption of liabilities when entering into a stock purchase agreement versus an asset purchase agreement is well-known in the business community. . . .
>
> . . . . [W]e conclude that the change in the form of the transaction was not just a superficial and inconsequential alteration.

*Columbia Propane*, 2003 WI 38, ¶¶ 27-30, 661 N.W.2d 776, ¶¶ 27-30. Although *Columbia Propane* addressed a question regarding assumption of liabilities rather than the broker's statute, this court does not believe the Supreme Court of Wisconsin would disregard the distinction between transactions for purposes of §§ 452.01 and 452.20.

---

[3]The statute in *J.L. Kislak* was described as requiring a broker's license for the sale of real estate; whether any licensing statute separately governed the sale of a business was not discussed.

After discovery, the facts of the present case may reveal that Bertha ventured into negotiations over assets or real estate as well as corporate stock. But the present motion is based on the complaint, wherein Bertha asserts that he is a securities broker and the Remy/Prestolite deal was a contemplated stock purchase transaction. As pled, Bertha's actions fall outside the scope of §§ 452.01(2)(d) and 452.20.

Remy's motion contains one further attack on claim two of the Amended Complaint, which asserts promissory estoppel. The existence of a contractual relationship bars a promissory estoppel claim, unless the contract fails to address the essential elements of the parties' total business relationship. *Kramer v. Alpine Valley Resort, Inc.*, 108 Wis. 2d 417, 425 (1982); *Teff v. Unity Health Plans Ins. Corp.*, 2003 WI App 115, ¶ 53, 265 Wis. 2d 703, ¶ 53. In the promissory estoppel claim, in paragraph 23 of the Amended Complaint, Bertha incorporated paragraphs 1 through 18. In paragraph 15, Bertha asserted that Remy "agreed to a new compensation arrangement for Plaintiff. Remy agreed that Remy would pay Plaintiff $400,000, regardless of whether or not the deal closed . . . ." (Am. Compl. ¶ 15.) Thus, the promissory estoppel claim has incorporated the allegation that an agreement exists. There is no suggestion in the Amended Complaint that the asserted contract did not address the essential elements of Bertha's relationship with Remy.

Although parties may present alternative and mutually exclusive claims in a complaint, the promissory estoppel claim would be alternative and mutually exclusive only if it alleged for purposes of that claim that no contract existed. The incorporation of the allegation that an agreement exists means that Bertha can have no promissory estoppel claim. Thus, claim two as pled will be dismissed. Therefore,

19

IT IS ORDERED that Bertha's motion for leave to file a surreply brief is denied.

IT IS ORDERED that Remy International's motion to dismiss is denied as to claim one but granted as to claim two.

IT IS ORDERED that the defendants file an affidavit indicating their states of incorporation to confirm that subject matter jurisdiction still exists in this case.

IT IS FURTHER ORDERED that a scheduling and status conference is set for **April 13, 2006, at 2:00 p.m.**.

IT IS ORDERED that the parties file a Fed. R. Civ. P. 26(f) report no later than **April 4, 2006.**

The court notes that Remy, Inc., has not been served. At the scheduling conference, the parties should be prepared to discuss the status of the claims against Remy, Inc.

Dated at Milwaukee, Wisconsin, this 31st day of January, 2006.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge